**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, New Jersey 07701-6777
Telephone: (732) 741-3900
Facsimile: (732) 224-6599
*Attorneys for Plaintiffs Carole Fiducci and
the Estate of Rita Pucci*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAROLE FIDUCCI and the ESTATE OF RITA PUCCI, | Civil Action No. |
| Plaintiffs, | |
| v. | |
| NELSON GARCIA, DAVID J. AUBEL a/k/a DAVID KOST, ANGEL INVESTMENT PARTNERS GROUP, INC., JOHN/JANE DOES 1-5, fictitious individuals to be named after discovery; and ABC CORPS. 1-5, fictitious corporate entities to be named after discovery; | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiffs Carole Fiducci ("Fiducci") and the Estate of Rita Pucci (the "Estate") (hereinafter collectively "Plaintiffs"), by way of Complaint against Defendants Nelson Garcia ("Garcia"), David J. Aubel a/k/a David Kost ("Aubel"), Angel Investment Partners Group ("Angel Investment"), John/Jane Does 1-5; and ABC Corporations 1-5 (hereinafter collectively "Defendants"), hereby states:

## PARTIES

1.      Plaintiff Fiducci is a citizen of New Jersey and resides at 263 Float Avenue, Manahawkin, New Jersey, 08050.

2.     Plaintiff Estate represents the interests of the late Rita Pucci, Fiducci's mother.

3.     Defendant Garcia is a citizen of North Carolina who resides at 11210 Hickory Trail Lane, Apt. 2625, Charlotte, NC 28277-6126.  Defendant Garcia is the managing director and/or principal of Defendant Angel Investment.

4.     Defendant Aubel is a citizen of North Carolina residing at 205 Stillwell Dr., Matthews, NC, 28194-6127, and is the president and/or principal of Defendant Angel Investment.  Upon information and belief, Defendant Aubel used the alias "David Kost" when incorporating and operating Defendant Angel Investment and in his dealings with Plaintiff.

5.     Defendant Angel Investment is a Florida corporation whose original principal place of business was 4000 Hollywood Boulevard, Suite 435S, Hollywood, Florida, 33021, which was incorporated by Defendant Aubel on February 10, 2015.  Upon information and belief, Defendant Angel Investment moved its office to 6201 Fairview Road, Suite 200, Charlotte, North Carolina, 28210.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper under federal question jurisdiction pursuant to 28 U.S.C. § 1331, as the allegations in this Complaint also assert violations of §10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.

7.     Jurisdiction is also proper under 28 U.S.C. § 1332 because this matter involves a dispute arising under state law where the parties have diversity jurisdiction, because neither Plaintiffs (who resides in New Jersey) nor any of the Defendants (who reside or have a principal place of business in the States of Florida and North Carolina) reside in the same state, and the amount in controversy exceeds $75,000.00.

8.      This Court has jurisdiction over state law and common law claims asserted herein under the doctrines of ancillary and pendant jurisdiction and pursuant to the supplemental jurisdiction provision of 28 U.S.C. § 1367(a).

9.      Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims occurred in this District and Plaintiff resides in this District.

## SUMMARY OF CLAIMS

10.     Fiducci's parents, the late Anthony Pucci and Rita Pucci ("the Puccis"), were married on June 23, 1956.

11.     The Puccis resided at 364 Jennings Road, Manahawkin, New Jersey, 08050.

12.     The Puccis had a business relationship with Defendant Garcia for more than twenty (20) years, utilizing him to make individual investments and provide financial advice.

13.     The investments that Garcia made on behalf of the Puccis predominantly involved stocks, individual retirement accounts and life insurance.

14.     Anthony Pucci died on April 26, 2015 at the age of 87.

15.     Rita Pucci was suffering from Alzheimer's disease and a host of serious ailments at the time of Anthony Pucci's death.

16.     In early June 2015 Garcia contacted Fiducci, at which point she informed him of her father's passing.

17.     Garcia then began calling Fiducci regularly, asking her about her mother's health and making inquiries regarding her personal finances and investments, as well as those of her parents.

18.     Garcia stated that he could assist Fiducci with her finances because of his longstanding relationship with her parents and the fact that he managed some of their investments.

19.     At one point, Garcia offered to serve as executor of Fiducci's estate.

20.     Garcia also began visiting Rita Pucci in New Jersey, staying in the Puccis' home, which is less than four miles from Fiducci's house.

21.     On July 11, 2015, Fiducci rushed Rita Pucci to the hospital due to internal bleeding, a fever and an infection, forcing her to be hospitalized for a few days.

22.     In the aftermath of her mother's hospitalization, Garcia told Fiducci that since her father had died and her mother was seriously ill, Fiducci should begin liquidating certain assets and changing the names on certain accounts.

23.     Fiducci was authorized to liquidate her parents' assets and change account names because she was the executor of her father's estate and held the power of attorney for her mother.

24.     Following Garcia's instructions, Fiducci began to change various accounts from her father's name to her mother name and to liquidate other investments.

25.     For example, Fiducci made two separate withdrawals of $50,000 from a Rita Pucci account at Fulton Bank of New Jersey ("Fulton") on July 20, 2015 at Garcia's urging.

26.     Although Fiducci had neither met Garcia prior to her father's death nor been privy to their discussions, Garcia told her that he had promised her father that he would "take care of his girls" after he died, in reference to Fiducci and Rita Pucci, and frequently used that phrase in his dealings with Fiducci.

27.     In August 2015, Rita Pucci was admitted to the hospital on a regular basis, nearly dying on several occasions.

28.    Garcia continued to call Fiducci throughout the fall of 2015, instructing her to continue changing accounts from her father's name to her mother's name and to liquidate other investments before her mother's condition worsened.

29.    Although Garcia ostensibly called Fiducci to ask about Rita Pucci's health, his calls increasingly focused on Fiducci's finances and his insistence that she change accounts to her mother's name and liquidate her parent's assets.

30.    Garcia also began pushing Fiducci to invest in Defendant Angel Investment at that time, the entity that he was affiliated with.

31.    Garcia described Angel Investment as the sort of investment Fiducci's father would have made and said that she should do the same.

32.    In particular, Garcia promised Fiducci that Angel Investment was a safe investment and that she was guaranteed to make a good return.

33.    Garcia also told Fiducci that Angel Investment was a family operated business, led by David Kost with the assistance of his family, which Fiducci later determined — after ascertaining that "David Kost" was an alias for David Aubel — included his wife Ellen Aubel, his sons Alexander Aubel, Adam Aubel and William Aubel, his father David Abel, as well as his brother Robert Aubel and his wife Catherine Aubel,

34.    Garcia claimed that David Kost was his superior in Angel Investment , although Fiducci never met Kost or his family personally and only spoke with him on the phone on a couple of occasions.

35.    The frequency of the calls from Garcia to Fiducci increased in the fall of 2015, with Garcia barely asking about Rita Pucci.

36.     Garcia began pressuring Fiducci to invest in Joey New York, Inc. ("Joey New York") through Angel Investment, which is a Miami, Florida-based public company, trading under the symbol "JOEY," which operates injectable skin treatment centers.

37.     Garcia also instructed Plaintiff to invest in Life Design Station Investments, a/k/a Inspire Entertainment, a/k/a American Picture House ("Inspire Entertainment") through Angel Investment, a television and film production company based at 1319 Yale Street, Santa Monica, CA.

38.     According to Garcia, the bonds issued by Joey New York and Inspire Entertainment were paying an excellent rate of return but that it would not last long because the interest rate was dropping fast.

39.     Garcia also claimed that both he and members of his family were heavily invested in Joey New York and Inspire Entertainment and that the returns were guaranteed.

40.     Starting on November 1, 2015 and continuing through March 1, 2017, Fiducci and Rita Pucci invested a total of $1,408,136.88 in Angel Investment at Garcia's instructions, all of which was to be used to purchase securities purportedly issued by Joey New York, Inspire Entertainment and a third entity, Glen Antrim Partners, LLC, a biotechnology company based at 11515 N. 84th Street, Omaha, Nebraska.

41.     With the exception of one instance where Garcia either forged Rita Pucci's signature or coerced her into signing the necessary paperwork, her funds were transferred by Fiducci, who had the power of attorney to do so, at Garcia's urging.

42.     Based on Garcia's false representations, Fiducci was led to believe she and/or her mother purchased $613,036.88 worth of bonds issued by Joey New York during that period as follows:

| Date Purchased | Promised Interest | Maturity Date | Amount |
|---|---|---|---|
| November 1, 2015 | 18% | November 1, 2016 | $50,000 |
| December 10, 2015 | 9.75% | December 10, 2016 | $50,000 |
| May 25, 2016 | 8.25% | May 25, 2016 | $50,000 |
| June 5, 2016 | 8.25% | June 5, 2017 | $100,000 |
| July 11, 2016 | 8.25% | July 11, 2017 | $50,000 |
| August 10, 2016 | 8.25% | August 10, 2017 | $18,036.88 |
| August 10, 2016 | 8.25% | August 10, 2017 | $40,000 |
| September 1, 2016 | 8.25% | September 1, 2017 | $45,000 |
| January 1, 2016 | 9.75% | January 1, 2017 | $210,000 |
| | | | Total: $613,036.88 |

43.     Fiducci was provided with purported Joey New York bond certificates totaling $613,036.88 and, in certain cases, copies of Joey New York debenture agreements signed by Garcia on behalf of Angel Investment. Copies of the Joey New York bond certificates are attached hereto as **Exhibit A**.

44.     In several instances Garcia wrote Fiducci on Angel Investment letterhead, thanking for her investments and promising quarterly interest payments.

45.     Based on Garcia's false representations, Fiducci was also led to believe she made a $50,000 total investment in Glen Antrim Partners on November 1, 2015 through purchase of a bond which promised 18% interest on the one year maturity date of November 1, 2016. A copy of the Glen Antrim Partners bond certificate is attached hereto as **Exhibit B**.

46.     Fiducci was also led to believe she and/or her mother purchased the following securities from Inspire Entertainment based on Garcia's false representations (Copies of the Inspire Entertainment bond certificates are attached hereto as **Exhibit C**):

| Date Purchased | Promised Interest | Maturity Date | Amount |
|---|---|---|---|
| November 1, 2015 | 9.75% | November 1, 2016 | $400,000 |
| December 31, 2015 Stock Purchase | | | $100.00 |
| November 16, 2015 | 9.75% | | $200,000 |
| March 1, 2016 | 8.25% | | $95,000 |
| | | | Total: $695,100.00 |

47.     In one instance, on or about February 16, 2017, Fiducci sent a check to Angel Investment for $50,000 for which she did not receive any bond certificate.

48.     All of the purported securities purchased by Plaintiffs were offered and sold to them within New Jersey.

49.     The purported securities sold by Angel Investment by Garcia and Kost were not federally registered nor were they registered with the New Jersey Bureau of Securities ("Bureau") or any other state securities regulator, nor were they exempt from registration.

50.     Neither Angel Investment nor Garcia nor Kost (eventually determined to be Aubel) were registered with the Securities and Exchange Commission, the Bureau, or any other state securities regulator.

51.     Upon information and belief, none of the certificates or securities issued by Angel Investment to Fiducci and Rita Pucci were authentic and were, rather, counterfeit certificates and securities.

52.     Generally speaking, the funds that Fiducci attempted to invest in Joey New York, Inspire Entertainment and Glen Antrim Partners through Angel Investment were either wired out of accounts Fiducci and/or Rita Pucci held at Fulton Bank of New Jersey ("Fulton") or JPMorgan Chase & Co. ("Chase") to an Angel Investment account at a Chase branch in Florida or deposited into a local Chase account by Fiducci via cashier's check or personal check (sometimes physically accompanied by Garcia) or mailed via check to Angel Investment's Florida office.

53.     For example, Fiducci wired $50,000 to Angel Investment out of a personal Fulton account on October 21, 2015, $200,000 on November 15, 2015, and $50,000 on December 4, 2015 and had a cashier's check for $100,000 made out to Angel Investment on January 11, 2016 and $50,000 made out to the entity on February 16, 2017.

54.     By way of further example, Fiducci wired $50,000 out of a Rita Pucci Fulton account to Angel Investment on November 2, 2015, and wrote two separate $40,000 checks to Angel Investment out of a Rita Pucci Fulton account on August 4, 2016 and August 30, 2016 respectively.

55.     In one instance, Fiducci had invested $610,000 in Fidelity & Guaranty Life Insurance Company ("Fidelity").

56.     When Garcia learned of Fiducci's investment in Fidelity, he told her it was a terrible mistake, incessantly pressuring her to withdraw the funds and invest them in Angel Investment, claiming it was what her father would do under the circumstances.

57.    Following Garcia's instructions, Fiducci requested the return of her entire $610,000 investment from Fidelity in December 2015.

58.    The $610,000 was then deposited in one of Fiducci's Fulton accounts on January 5, 2016.

59.    On January 15, 2016, Fiducci withdrew $510,000 from the Fulton account by way of a cashier's check, which she then deposited into an Angel Investment Chase account per Garcia's instructions.

60.    Fiducci was sometimes issued bond certificates months after she made the $1,458,136.88 in investments in Angel Investment.

61.    With respect to the investments Fiducci was asked to make in January 2016, Garcia flew to the Atlantic City, New Jersey airport, visited Rita Pucci, personally accompanied Fiducci to Fulton bank to make transfers to Angel Investment's account, and then asked her to drive him back to the Atlantic City airport.

62.    Although Fiducci told Garcia that his January 2016 trip should not go forward because her dog was ill — dying on the very day Garcia visited — he insisted on coming because he had a non-refundable plane ticket.

63.    Garcia also flew in to Atlantic City on March 5, 2016, was picked up by Fiducci at the airport, and accompanied her to Fulton bank to make additional transfers to Angel Investment, before taking a bus to New York City.

64.    On a separate occasion in March 2016, Garcia had Rita Pucci fill out paperwork transferring $58,000 in funds she held in at NuView, a self-directed IRA custodian, to Angel Investment, ostensibly to purchase a convertible debenture bond paying 8.25% issued by Inspire Entertainment.

65.     Rita Pucci had originally moved the money into NuView from a Hudson City Savings Bank IRA at Garcia's instructions.

66.     Fiducci was not present when Rita Pucci executed the forms transferring the funds from NuView to Angel Investment and did not authorize Garcia or her mother to execute the document.   Upon information and belief, Garcia either coerced Rita Pucci into signing the documents or forged her signature to effect the transfer.

67.     Both Fiducci and Rita Pucci were told by Garcia that NuView was an actual investment, rather than a custodial account, and that the money would remain there and pay a good rate of return.

68.     Neither Fiducci nor Rita Pucci intentionally authorized Garcia to transfer the $58,000 in IRA funds to Angel Investment.

69.     Rita Pucci was provided with a copy of a purported Inspire Entertainment debenture bond with respect to the $58,000 investment, which was countersigned by Garcia.

70.     No distributions have been made to Fiducci or Rita Pucci with respect to the NuView/Inspire Entertainment transaction.

71.     Fiducci continues to receive invoices from NuView demanding payment.

72.     On May 23, 2016, Garcia again flew to Atlantic City, was picked up by Fiducci at the airport and stayed at Rita Pucci's home.

73.     During their frequent telephone discussions during this period, Garcia told Fiducci that "Dad would be proud" of the investments she was making in Angel Investment.

74.     Rita Pucci died on November 2, 2016 at the age of 82.

75.     Following Rita Pucci's death, Garcia and his wife flew from North Carolina to New Jersey for her memorial service.

76.     Garcia and his wife were invited to the memorial service but had not arranged for transportation, forcing Fiducci and her family and friends to expedite the service and transport them to two separate and distant locations in New Jersey following the memorial.

77.     Garcia also encouraged Fiducci to make him the executor of her estate in light of the fact that she was unmarried and had not children, which she ultimately agreed to do, naming him as the executor in her will.

78.     Fiducci also revised her will to provide that Garcia would inherit her parents' home in the event of her death, also at his urging.

79.     Throughout 2016 and 2017, Fiducci and Rita Pucci (until the time of her death) intermittently received monthly interest payments with regard to their investments with Angel Investment.

80.     Garcia would wire interest payments into Fiducci's account at Fulton or send a check, occasionally detailing the total interest payments either via an email or verbally on the phone.

81.     On certain occasions, interest checks and wires were missing or were never sent to Fiducci and Rita Pucci at all.

82.     Fiducci and Rita Pucci never received a true account statement or any summary of their investments with Angel Investment.

83.     Fiducci and Rita Pucci were not provided with online access to view their investments with Angel Investment.

84.     On several occasions, Garcia provided Fiducci with a screenshot of a computer screen purporting to show the status of the interest payments owed on the investments she had made in Angel Investment.

85.     Garcia provided the information regarding the interest payments only when Fiducci repeated it.

86.     The only documentation Fiducci and Rita Pucci were provided by Angel Investment were bond certificates roughly corresponding to various investments, debenture bond agreements signed by Garcia, and correspondence.

87.     There were many months throughout 2016 and 2017 when Angel Investment either did not make any interest payments to Fiducci or Rita Pucci or the interest payments were late.

88.     In or about May 2017, Garcia pleaded with Fiducci to loan him $4,000 so that he could purchase a hearing aid.

89.     Fiducci acceded to Garcia's request, sending two separate wires of $2,000 to him on June 7, 2017 and June 8, 2017 from her Chase account.

90.     By letter dated May 30, 2018, Fiducci demanded that Garcia repay the $4,000 loan, which should have been repaid months prior.

91.     To date, Garcia has failed and refused to repay the interest-free $4,000 loan made by Fiducci.

92.     On another occasion in the summer of 2017, Garcia offered Fiducci a complimentary treatment at a facility operated by Joey New York in Sunny Isles Beach, Florida as a perk and to encourage her to make additional investments in Angel Investment and Joey New York.

93.     Fiducci accepted Garcia's offer and received a treatment at the Joey New York facility in Sunny Isles Beach, Florida.

94.     On other occasions, Garcia sent Fiducci promotional materials regarding Joey New York which hyped the company's projected profits.

95.     For example, on March 24, 2017, Garcia sent Fiducci promotional materials that set forth projected revenue for Joe New York of $12,148,113 in 2017, $40,183,936 in 2018, $80,367,872 in 2018, $118,951,808 in 2020 and $157,535,744 in 2021, net profits of $5,080,929 in 2017, $17,353,536 in 2018, $34,707,072 in 2019, $51,495,608 in 2020 and $68,284,144 in 2021.

96.     The Joey New York promotional materials sent by Garcia to Fiducci on March 24, 2017 further projected that the earnings per share would jump from $0.18 per share in 2017 to $1.39 per share in 2021, a projected increase of 672%.

97.     By the fall of 2017, Angel Investment stopped making any interest payments to Fiducci.

98.     Although the principal on the securities purchased by Fiducci and Rita Pucci was owed on their respective maturity date, with the obligation starting as early as November 1, 2016, none of the principal has been returned.

99.     Fiducci had numerous discussions, email and text communications with Garcia in the latter half of 2017 and beginning of 2018 regarding Angel Investment's failure to return the principal on the subject securities, but he could never account for the missing funds.

100.    On several occasions, Garcia blamed Angel Investment failure to pay on David Kost and his family.  In particular, Garcia told Fiducci that David Kost's children and family had invested her money in such a way that it was inaccessible.

101.   When Fiducci spoke with an individual who identified himself as "David" on the phone — who she was led to believe was David Kost — he apologized, stating that Angel Investment was a start-up company and that the problems would soon be resolved.

102.   On February 12, 2018, Fiducci contacted Joey New York directly to ask about the status of her $663,036.88 investment in the company.

103.   Fiducci was directed to speak with one of the principals of Joey New York, Ricard Chancis ("Chancis"), who told her that he was unaware of her making any investments in the company.

104.   Fiducci was informed that an individual named David J. Aubel ("Aubel"), an associate of Garcia, had agreed to raise one to three million dollars for Joey New York a few years prior in order to help the company expand.

105.   Fiducci first learned, at that time, that Kost and Aubel were the same person, and that Aubel had raised $100,000 at most for Joey New York pursuant to a stock purchase agreement with a single individual.

106.   When pressed by Fiducci, Garcia acknowledged that Kost and Aubel were the same person.

107.   Following that discussion, Fiducci determine that Aubel had a criminal background and, with Garcia, had defrauded her out of $1,408,136.88 through the offer and sale of bogus securities.

108.   Joey New York confirmed that the certificates in Fiducci's possession were counterfeit and indicated that the company had not received any investment from her, via Garcia, Aubel/Kost or otherwise.

109.    Upon information and belief, all of the certificates and debenture bonds provided to Plaintiffs by Angel Investment, whether from Joey New York, Inspire Entertainment or Glen Antrim Partners, are counterfeit.

110.    Although Garcia, Aubel and Angel Investment held themselves out as making investments in these entities on behalf of Fiducci and Rita Pucci, they were, in reality, using Plaintiffs' funds for their own purposes.

111.    By letter to Garcia and Aubel/Kost dated March 7, 2018 ("March 7, 2018 Letter"), Fiducci's counsel demanded redemption and liquidation of all securities issued by Angel Investment, further requesting all necessary forms for the completion and liquidation of the securities.

112.    Fiducci's counsel further advised Angel Investment, via the March 7, 2018 Letter, that the company had issued seven checks in the total amount of $10,627.57, all of which had been dishonored by the issuing bank, causing her to incur fees and/or penalties with respect to each of the subject checks.

113.    The March 7, 2018 Letter advised Angel Investment that unless Fiducci was made whole in the amount of $1,408,136.88 within ten days of the date of the letter, she would contact the appropriate prosecutorial authorities in North Carolina, Florida and the federal government.

114.    To date, none of the securities that Fiducci and Rita Pucci purchased from Angel Investment through Garcia and Aubel/Kost has been redeemed and liquidated.

115.    On April 6, 2016, a criminal complaint was filed in the United States District Court for the District of Massachusetts, charging Aubel and his business partner Robert J. Raffa ("Raffa") with violation of 18 U.S.C. § 371, Conspiracy to Commit Wire Fraud, and 18 U.S.C. §§ 1343 and 1349, Wire Fraud in connection with charges arising out of their participation in a

market manipulation scheme involving and entity called Green Energy Renewable Solutions, Inc.

116.    Aubel pled guilty to the charges in December 2017 and is sentenced to be tried on July 26, 2018.

117.    Aubel has been a named defendant in previous securities fraud-based proceedings, including the 2008 SEC v. Video Without Borders, Inc. matter, wherein the Securities and Exchange Commission filed a civil injunctive action against Florida-based Video Without Boundaries (a/k/a China Logistics Group, Inc.)(Video), an electronics and entertainment company, as well as it principal financial and accounting officer and largest shareholder, Aubel. The SEC's complaint alleges that in 2003, Aubel and his associate issued a series of false and misleading press releases and then took advantage of the company artificially inflated stock to dump millions of share of stock, reaping millions of dollars in the process.

118.    Angel Investment, Garcia and Aubel have caused Fiducci and the Estate of Rita Pucci to suffer damages in the amount of at least $1,408,136.88, plus interest and for an exact amount to be determined at trial, and Defendants' refusal to make Plaintiffs' whole now has forced Plaintiffs to file this suit to recover monies among other bases, violations of the Securities Exchange Act, 15. U.S.C. § 78(a), *et seq.*, together with State causes of action for securities fraud, common law fraud, fraud in the inducement, equitable fraud, breach of fiduciary duties, professional negligence, breach of contract and conversion.

**COUNT I**
**(VIOLATION OF SECTION 10(b) of the SECURITIES EXCHANGE ACT, 15**
**U.S.C. § 78j(b) and SEC RULE 10b-5, 17 C.F.R. § 240.10B-5)**

119.    Plaintiffs reallage and incorporate by reference the allegations set forth in Paragraphs 1 through 118 as if set forth herein.

120.    Defendants carried out a plan, scheme and course of conduct that was intended to and deceived Plaintiffs, inducing them to invest a total of $1,408,136.88 in Angel Investment, purportedly to purchase securities from Joey New York, Inspire Entertainment and Glen Antrim Partners.

121.    The bonds and stocks purchased by Plaintiffs, if legitimate, constitute a "security" under the Securities Exchange Act of 1934 and Rule 10b-5.

122.    Plaintiffs suffered damages as a result of investing in Angel Investment.

123.    Defendants, directly or indirectly, singularly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce or of the mails, knowingly or with reckless disregard for the truth:

    a.  employed devices, schemes, or artifices to defraud;

    b.  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.  engaged in acts, practices or courses of business which operate or would operate as a fraud and deceit upon purchasers of securities, including Plaintiff, or upon other persons, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongly caused Plaintiff to suffer damages of at least $1,000,000 in violation of section 10(b) of the Exchange Act and Rule 10b-5.

124.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information regarding Angel Investment to sell securities.

125.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

126.   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

127.   In particular, Defendants sought to conceal that they were issuing counterfeit securities and that Plaintiffs were not truly invested in Joey New York, Inspire Entertainment and Glen Antrim Partners.

128.   As a result of Defendants' statements of materially false and misleading information and failure to disclose material facts, Plaintiffs investment in Angel Investment were not as they purported to be, and were illegally used for the benefit of Defendants.

129.   Plaintiffs relied directly or indirectly on the false and misleading statements made by Defendants and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, who did not disclose the information to Plaintiffs.

130.   As a result, Plaintiffs purchased counterfeit securities in Joey New York, Inspire Entertainment and Glen Antrim Partners from Angel Investment for $1,408,136.88 and lost their entire investment.

131.   Had Plaintiffs known the truth regarding Defendants' fraudulent investment schemes at the time they made their misrepresentations and omissions, they would not have purchased counterfeit securities from Joey New York, Inspire Entertainment and Glen Antrim Partners from Angel Investment.

132.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

133.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in their favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

**COUNT II**
**(VIOLATIONS OF THE NEW JERSEY UNIFORM SECURITIES ACT, N.J.S.A.
49:3-47 et seq.)**

134.    Plaintiffs reallages and incorporates by reference the allegations set forth in Paragraphs 1 through 133 as if set forth herein.

135.    Under N.J.S.A. § 49:3(a) and (c), it is "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading."

136.    Under N.J.S.A. §49:3-52(b), it is "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly [t]o make any untrue statement of a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading."

137.    Defendants are "persons" within the meaning of N.J.S.A. 49:3-49(i).

138.    Each of the securities purportedly issued by Joey New York, Inspire Entertainment and Glen Antrim Partners, which Plaintiff purchased from Angel Investment constitute a "security" within the meaning of <u>N.J.S.A.</u> 49:3-49(m).

139.    The securities purportedly issued by Joey New York, Inspire Entertainment and Glen Antrim Partners, which Plaintiff purchased from Angel Investment , were not registered with the New Jersey Bureau of Securities or exempt from registration.

140.    Defendants are offers or sellers of securities within the meaning of <u>N.J.S.A.</u> 49:3-49(j)(1)-(2) because they issued, marketed and or sold the securities in Joey New York, Inspire Entertainment and Glen Antrim Partners for their own financial benefit.

141.    Neither Garcia nor Aubel is registered to act as agent in selling securities, in violation of <u>N.J.S.A.</u> 49:3-56(a).

142.    Angel Investment employed or engaged Garcia and Aubel in effecting or attempting to effect transactions in securities in New Jersey, despite the fact that they were not registered with the New Jersey Bureau of Securities, in violation of <u>N.J.S.A.</u> 49:3-56(h).

143.    Defendants offered and sold securities in Joey New York, Inspire Entertainment and Glen Antrim Partners in the State of New Jersey within the meaning of <u>N.J.S.A.</u> §2C:1-3.

144.    Defendants knowingly made numerous material misstatements and omissions in selling securities to Plaintiffs through Angel Investment.

145.    Defendants made these misrepresentations and omissions with the purpose and intent of convincing Plaintiffs to purchase securities in Joey New York, Inspire Entertainment and Glen Antrim Partners.

146.    Plaintiffs did not know, and in the exercise of due diligence could not have known of the misrepresentations and omissions made by Defendants.

147.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT III
## (COMMON LAW FRAUD/FRAUD IN THE INDUCEMENT)

148.   Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 147 as if set forth herein.

149.   Defendants made, authorized, or caused the representations discussed above to be made.

150.   The material misrepresentations made above were fraudulent and Defendants also fraudulently omitted material statements of fact.

151.   Defendants knew their representations and omissions were false and/or misleading at the time they were made.

152.   Defendants made the misleading statements with the intent to defraud Plaintiffs.

153.   Defendants had reason to expect that Plaintiffs would receive and reply upon their misrepresentations, and intended that their misleading statements would induce Plaintiff to invest $1,408,136.88 in Angel Investment.

154.   Plaintiffs justifiably relied upon Defendants' false representations and misleading omissions.

155.   If Plaintiffs knew the truth regarding Angel Investment and the fraudulent securities it issued with regard to Joey New York, Inspire Entertainment and Glen Antrim Partners, or the fact that the principal and interest on those securities would not be paid, Plaintiffs would not have invested in Angel Investment.

156.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT IV
## (EQUITABLE FRAUD)

157.   Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 156 as if set forth herein.

158.   Defendants made, authorized or caused material representations and/or omissions, as detailed above.

159.   Defendants' representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

160.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.

161.    Plaintiffs would not have invested $1,408,136.88 in Angel Investment if they had known the truth regarding the company and the counterfeit securities it issued with regard to Joey New York, Inspire Entertainment and Glen Antrim Partners, or the fact that the principal and interest on those securities would not be paid

162.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT V
## (CONVERSION)

163.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 162 as if set forth herein.

164.    Plaintiffs owned or had the right to possess the funds used to make the $1,408,136.88 investment in Angel Investment.

165.    Defendants, through their fraudulent scheme, illegally exercised dominion and control over those funds, particularly the $1,408,136.88 that was purportedly used by Angel Investment to purchase securities from Joey New York, Inspire Entertainment and Glen Antrim Partners.

166.    Defendants' wrongful dominion and control deprived Plaintiffs of the use of those funds, particularly $1,408,136.88.

167.   The wrongful dominion and control has caused damage to Plaintiffs in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

### COUNT VI
### (UNJUST ENRICHMENT)

168.   Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 167 as if set forth herein.

169.   As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs.

170.   When Plaintiffs made a $1,408,136.88 investment in Angel Investment, they reasonably believed that Defendants were acting in good faith in furtherance of legitimate transactions.

171.   Instead, Defendants acted improperly, unjustly and unlawfully, taking Plaintiffs' money for their own benefit in exchange for fraudulent securities.

172.   Defendants have been enriched at Plaintiffs' expense though their $1,458,136.88 investment in Angel Investment.

173.   Defendants' retention of Plaintiffs' money violates fundamental principles of justice, equity and good conscience.

174.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in any event no less than $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT VII
## (BREACH OF CONTRACT)

175.     Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 174 as if set forth herein.

176.     Plaintiffs executed contracts with Angel Investment in the form of purported debenture bonds and other securities signed by Garcia on behalf of the company, which purported to represent Joey New York, Inspire Entertainment and Glen Antrim Partners.

177.     Plaintiff complied with the terms of the purported debenture bonds and other securities by advancing the required funds to Angel Investment.

178.     Defendants materially breached the terms of the securities purportedly issued by Joey New York, Inspire Entertainment and Glen Antrim Partners by failing to pay the specified interest or returning the promised principal when due.

179.     Plaintiffs have been damaged by the Defendants breach of the subject contractual obligations in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT VIII
## (BREACH OF FIDUCIARY DUTY)

180.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 179 as if set forth herein.

181.    Defendants owed Plaintiffs a fiduciary duty.

182.    Defendants knowingly breached their fiduciary duty to Plaintiffs based upon the actions described above.

183.    As a result of Defendants breach of their respective duties to Plaintiffs, Plaintiffs suffered damages in the amount of at least $1,408,136.88.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,408,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## COUNT IX
## (ACCOUNTING)

184.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraph 1 through 183 as if set forth herein.

185.    Defendants have not disclosed any information to Plaintiffs as to the status of their investments and what funds, if any, were legitimately invested in Joey New York, Inspire Entertainment and Glen Antrim Partners.

186.    Defendants have also concealed what interest, if any, has been earned on their investment, and how their funds have been utilized.

187.    Accordingly, Plaintiffs are entitled to review the financial records and books of Angel Investment and its principals and hereby demands an accounting regarding same.

**WHEREFORE**, Plaintiffs hereby demands judgment be entered in her favor and against Defendants, together with John/Jane Does 1-5 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $1,458,136.88, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Carole Fiducci and the Estate of Rita Pucci hereby demand a trial by jury of any issue triable of right by a jury.


Dated: June 21, 2018

**GIORDANO, HALLERAN & CIESLA, P.C.**

By:  /s/ Paul E. Minnefor
Paul E. Minnefor
Donald F. Campbell
125 Half Mile Road, Red Bank, N.J. 07701
(732) 741-3900
*Attorneys for Plaintiff Carole Fiducci*

# EXHIBIT A



JOEY
NEW YORK®
EST. 1995

**$50,000.00**

18% Subordinated Corporate Convertible Debenture

Due and Convertible on November 1, 2016

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Carole Fiducci to $50,000.00 Dollars together with interest thereon at a rate of

EIGHTEEN PER CENT PER ANNUM

in accordance with the terms and conditions of the attached Convertible Debenture Contract Conversion of the Convertible Debenture to voting Common Stock is to occur on November 1, 2016

Dated this 1 day of November 2015

_____
Authorized Signature

JOEY
NEW YORK®
Est 1999

**$50,000.00**

9.75% Subordinated Corporate Convertible Debenture
Due and Convertible on December 10, 2016

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Carole Fiducci to
$50,000.00 Dollars together with interest thereon at a rate of
NINE AND THREE QUARTERS PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract.
Conversion of the Convertible Debenture to voting Common Stock is to occur on
December 10, 2016

Dated this 10 day of December 2015

_____
Authorized Signature



J O E Y
NEW YORK®
— Est.1993 —

**$50,000.00**

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on May 25, 2017

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to
$50,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur on
May 25, 2017

Dated this 25th day of May, 2016

_____
Authorized Signature



JOEY
NEW YORK®
—— Est.1993 ——

$100,000.00

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on June 5, 2017

Joey New York, Inc.

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to
$100,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur on
June 5, 2017

Dated this 5th day of June, 2016

Authorized Signature



JOEY
NEW YORK®
Est 1993

**$50,000.00**

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on July 11, 2017

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to
$50,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur on
July 11, 2017

Dated this 11th day of July, 2016

_____
Authorized Signature

## JOEY
### NEW YORK®
— Est.1993 —

## $18,036.88

### 8.25% Subordinated Corporate Convertible Debenture
### Due and Convertible on August 10, 2017

## Joey New York, Inc.

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to $18,036.88 Dollars together with interest thereon at a rate of EIGHT AND ONE QUARTER PER CENT PER ANNUM in accordance with the terms and conditions of the attached Convertible Debenture Contract Conversion of the Convertible Debenture to voting Common Stock is to occur on August 10, 2017

Dated this 10ᵗʰ day of August, 2016

_____
Authorized Signature



JOEY
NEW YORK ®
—— Est.1993 ——

**$40,000.00**

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on August 10, 2017

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to
$40,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER   ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur  on
August 10, 2017

Dated this 10th day of August, 2016



_____
Authorized Signature



JOEY
NEW YORK®
— Est 1993 —

$45,000.00

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on September 01, 2017

**Joey New York, Inc.**

*This Corporate Convertible Debenture* entitles Caroline P. Fiducci to
$45,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur on
September 01, 2017

Dated this 1st day of September, 2016

_____
Authorized Signature

JOEY
NEW YORK®
Est 1994

$210,000.00

9.75% Subordinated Corporate Convertible Debenture
Due and Convertible on January 1, 2016

Joey New York, Inc.

*This Corporate Convertible Debenture* entitles Carole Fiducci to
$50,000.00 Dollars together with interest thereon at a rate of
NINE AND THREE QUARTERS PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract
Conversion of the Convertible Debenture to voting Common Stock is to occur on
January 1, 2017

Dated this 1 day of January 2016

_____
Authorized Signature

# EXHIBIT B

CD No. 1101

18% SUBORDINATED CORPORATE CONVERTIBLE DEBENTURE DUE AND CONVERTIBLE
NOVEMBER 1, 2016

# $50,000

## GLEN ANTRIM PARTNERS, INC.

**THIS CORPORATE CONVERTIBLE DEBENTURE** entitles Carole P. Fiducci to FIFTY THOUSAND Dollars together with interest thereon at the rate of EIGHTEEN PER CENT PER ANNUM in accordance with the terms and conditions of the attached Convertible Debenture Contract.

Conversion of the Convertible Debenture to voting common stock is to occur on November 1, 2016.

Dated this 1st day of November 2015



_____
Authorized Signature

# EXHIBIT C

$400,000.00

9.75% Subordinated Corporate Convertible Debenture
Due and Convertible on January 1, 2017

**American Picture House, Inc.**



This *Corporate Convertible Debenture* entitles Carole Fiducci to
$400,000.00 Dollars together with interest thereon at a rate of
NINE AND THREE QUARTERS PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract.
Conversion of the Convertible Debenture to voting Common Stock is to occur on
January 1, 2017

Dated this 1st day of January, 2016

_____
Authorized Signature



$200,000.00

9.75% Subordinated Corporate Convertible Debenture
Due and Convertible on November 16, 2016

**American Picture House, Inc.**

This *Corporate Convertible Debenture* entitles Carole Fiducci to
$200,000.00 Dollars together with interest thereon at a rate of
NINE AND THREE QUARTERS PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract.
Conversion of the Convertible Debenture to voting Common Stock is to occur on
November 16, 2016

Dated this 16 day of November, 2015

_____
Authorized Signature



$95,000.00

8.25% Subordinated Corporate Convertible Debenture
Due and Convertible on March 1, 2017

**American Picture House, Inc.**

This *Corporate Convertible Debenture* entitles Carole Fiducci to
$95,000.00 Dollars together with interest thereon at a rate of
EIGHT AND ONE QUARTER PER CENT PER ANNUM
in accordance with the terms and conditions of the attached Convertible Debenture Contract.
Conversion of the Convertible Debenture to voting Common Stock is to occur on
March 1, 2017

Dated this 1st day of March, 2016

_____
Authorized Signature